UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND MCCOWAN,<br><br>Plaintiff,<br><br>v.<br><br>L. MCKEOWN, et al.,<br><br>Defendants. | No. 2:21-cv-0369-DAD-CKD P<br><br><br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff Raymond McCowan is a state prisoner proceeding pro se with a civil rights action filed pursuant to 42 U.S.C. § 1983. Defendants' motion for summary judgment is before the court. (ECF No. 70.) The motion should be granted because plaintiff fails to raise a genuine issue of material fact for trial on any remaining excessive force or deliberate indifference claim. In light of this determination, and in the interests of judicial economy, the court need not address defendants' remaining argument based on qualified immunity.

**PROCEDURAL BACKGROUND**

Plaintiff filed the operative second amended complaint on May 23, 2022. (ECF No. 31.) After the court's screening of the complaint required by 28 U.S.C. § 1915A(a), this case proceeded on his Eighth Amendment excessive force claim against defendants McKeown and Stephens-Merrill and his Eighth Amendment deliberate indifference claim against defendants McAllister, Ota, and Harris. (ECF Nos. 35, 40.)

1

1       On July 25, 2024, defendants filed the motion for summary judgment presently before the
2 court. (ECF No. 70.) Plaintiff opposed the motion. (ECF Nos. 77, 90.) Defendants filed a reply.
3 (ECF No. 92.)

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

5       Summary judgment is appropriate when the moving party shows there is "no genuine
6 dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
7 Civ. P. 56(a). In order to obtain summary judgment, "[t]he moving party initially bears the burden
8 of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627
9 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The
10 moving party may accomplish this by "citing to particular parts of materials in the record,
11 including depositions, documents, electronically stored information, affidavits or declarations,
12 stipulations (including those made for purposes of the motion only), admission, interrogatory
13 answers, or other materials" or by showing that such materials "do not establish the absence or
14 presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to
15 support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

16      "Where the non-moving party bears the burden of proof at trial, the moving party need
17 only prove that there is an absence of evidence to support the non-moving party's case." Oracle
18 Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B).
19 Summary judgment should be entered "after adequate time for discovery and upon motion,
20 against a party who fails to make a showing sufficient to establish the existence of an element
21 essential to that party's case, and on which that party will bear the burden of proof at trial."
22 Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the
23 nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

24       If the moving party meets its initial responsibility, the burden then shifts to the opposing
25 party to establish that a genuine issue as to any material fact does exist. Matsushita Elec. Indus.
26 Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence
27 of this factual dispute, the opposing party may not rely upon the allegations or denials of its
28 pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

2

1  admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P.
2  56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in
3  contention is material, i.e., a fact "that might affect the outcome of the suit under the governing
4  law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific
5  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e.,
6  "the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"
7  Anderson, 447 U.S. at 248.

       In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

       "In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Central Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

**EVIDENCE**

       Plaintiff's opposition to the motion for summary judgment responds to defendants' statement of undisputed facts but does not cite any disputing competent evidence as required by Local Rule 260(b). (ECF No. 77 at 15-21.) Nevertheless, this court affords leniency to pro se litigants, particularly in civil rights cases. See, e.g., Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th

Cir. 2012) (quoting Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010)). Accordingly, the court will consider the entire record.

Defendants' motion asserts the operative second amended complaint is unverified and that plaintiff failed to submit competent evidence in opposition to the motion. (ECF No. 70-1 at 26.) To the contrary, the court finds plaintiff signed the pleading under the penalty of perjury. (ECF No. 31 at 29.) The court considers the allegations therein as evidence in opposition to summary judgment to the extent they are based on plaintiff's personal knowledge of specific facts that are admissible. See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004); Lopez v. Smith, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000). Plaintiff has also submitted two brief declarations signed under penalty of perjury in opposition to the motion. (ECF No. 77 at 21-24.)

Plaintiff attempts to dispute many of defendants' facts by claiming they are false and fabricated. However, argumentative statements unsupported by competent evidence do not create issues of fact for trial. See Flaherty v. Warehousemen, Garage & Service Station Employees' Local Union No. 334, 574 F.2d 484, 486 n. 2 (9th Cir. 1978) (assertions made in legal memoranda are not evidence); Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("statements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be cidered on a motion for summary judgment"). Thus, neither a mere claim that a matter is disputed nor an unsworn argument will suffice to dispute a proposed undisputed fact that is supported by competent evidence.

I. **Plaintiff's Verified Allegations**[1]

In the first cause of action, plaintiff alleges both defendants McKeown and Stephens-Merrill maliciously and sadistically sprayed him directly in the face with pepper spray on March 1, 2018, while plaintiff was being held in a choke hold by another inmate who had attacked plaintiff. (ECF No. 31 at 3, 6, 7.) Plaintiff posed no threat to anyone when he was pepper sprayed.

---

[1] Statements that are legal conclusions, speculative assertions, and statements of hearsay evidence do not satisfy the standards of personal knowledge, admissibility, and competence required by Federal Rule of Civil Procedure 56(c)(4). Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citations omitted).

4

(Id.) The actions of defendants McKeown and Stephens-Merrill assisted plaintiff's attacker by pepper spraying plaintiff in his face while his attacker kept on with the assault. (Id. at 8.) From the effects of the pepper spray, plaintiff suffered pain and burning sensation which lasted for 24 hours. (Id. at 3, 6, 8.) In addition, while trying to free himself from the chokehold, plaintiff slipped from the "over spray of pepper spray" causing serious injury to his left knee which required surgery for repair. (Id. at 4, 6-8.) It took several officers to free plaintiff from his attacker. (Id.) Plaintiff then immediately submitted to the officers' mechanical restraints and never resisted. (Id.)

In the second cause of action, plaintiff alleges defendants McAllister, Ota, and Harris refused to examine his left knee and delayed appropriate medical care in violation of the Eighth Amendment. (ECF No. 31 at 11-14.) After the attack by inmate Robinson, plaintiff had a hole in his left knee and severe swelling. (Id. at 12.) Dr. McAllister walked by plaintiff in the waiting room, and, after nurses explained about plaintiff's serious knee injury, Dr. McAllister went on a coffee break without examining plaintiff's left knee. (Id. at 11.) Plaintiff asked a correctional officer to go get Dr. McAllister and the officer returned and stated Dr. McAllister is not coming because he's drinking coffee. (Id. at 12.) Dr. McAllister did not send plaintiff out to the hospital for an x-ray that night. (Id.) Because Dr. McAllister did not write plaintiff a chrono for lower tier, plaintiff had to climb up the stairs to his housing unit, causing pain and further injury. (Id.)

The next day, plaintiff wanted to have his knee examined by his primary care provider, Dr. Ota. (ECF No. 31 at 13-14.) However, Dr. Ota "refuse[d] plaintiff a medical examination" and would not even come into the room for the examination by Nurse Harris. (Id. at 13.) Dr. Ota knew the damage plaintiff had suffered after talking to the x-ray technician, and her only plan was to order an MRI while refusing to personally examine plaintiff. (Id. at 13-14.) Plaintiff asked Nurse Harris what was preventing Dr. Ota from coming in to examine plaintiff and Harris said Dr. Ota is surfing the web online, that's why she's not coming. (Id.) Nurse Harris took plaintiff to B2-medical supply in a wheelchair only to give plaintiff a knee brace after which plaintiff had to walk back to Victor-wing. (Id.) After this appointment, plaintiff suffered a further injury in the form of a tear to his right quadricep muscle. (Id.)

## II.  Defendants' Evidence[2]

At all relevant times, plaintiff was a state prisoner incarcerated at California Medical Facility ("CMF") and the defendants were employed by CDCR and working at CMF. (ECF No. 70-2 at 2; ECF No. 77 at 15.) Defendants McKeown and Stephens-Merrill were Correctional Officers; Defendants McAllister and Ota were physicians; and Defendant Harris was a registered nurse. (Id.)

On March 1, 2018, plaintiff and inmate Robinson were physically fighting in the Unit IV V-Wing corridor. (ECF No. 70-4, ¶ 3; ECF No. 70-5, ¶ 3.) Defendants Stephens-Merrill and McKeown verbally ordered the inmates to get down and stop fighting, but the fighting continued. (Id.) Defendant Stephens-Merrill used her radio to call for an emergency staff response and saw defendant McKeown and another officer run toward plaintiff and inmate Robinson. (ECF No. 70-5, ¶ 3.)

According to defendant Stephens-Merrill, but disputed by plaintiff's verified allegations, Stephens-Merrill did not see what force or action was taken by staff to stop the fighting because she was maintaining visual observation of other inmates. (ECF No. 70-5, ¶ 4.) According to defendant Stephens-Merrill, but disputed by plaintiff's verified allegations, Stephens-Merrill did not deploy pepper spray or use physical force on plaintiff at any time. (Id.)

As defendant McKeown approached plaintiff and inmate Robinson, McKeown observed Robinson holding plaintiff's head with his left arm and punching plaintiff with his right fist while he held plaintiff's head with his left arm. (ECF No. 70-4, ¶ 3.) When McKeown came within approximately six feet, she deployed her pepper-spray cannister and dispersed spray, striking both plaintiff and inmate Robinson in their faces.[3] (Id., ¶ 4.) Inmate Robinson continued to punch plaintiff with his right fist until another officer grabbed Robinson and the inmates were physically separated from each other. (Id.) Defendant McKeown had plaintiff in a prone position and defendant Stephens-Merrill handcuffed plaintiff and conducted a clothed-body search. (Id.)

---

[2] Except where otherwise specifically indicated, these facts are undisputed.

[3] Plaintiff attempts to dispute this fact by repeatedly arguing pepper spray was sprayed directly in plaintiff's face, but plaintiff has not submitted any competent evidence disputing that McKeown sprayed both plaintiff and inmate Robinson in their faces and struck both inmates in their faces.

6

1  Defendants Stephens-Merrill and McKeown escorted plaintiff to an eyewash station for
2  decontamination. (Id.)
3        Defendant Stephens-Merrill issued plaintiff a Rules Violation Report ("RVR") for
4  fighting. (ECF No. 70-5, ¶ 8 & Ex. B; ECF No. 70-3 at 5-6.) Plaintiff was found guilty of the
5  offense. (Id.)
6        Fighting between inmates can be an emergency situation for several reasons, including
7  that it poses a risk of injury to the involved inmates and can jeopardize the safety of other
8  inmates, and can disrupt the order of the prison and pull the focus and attention of correctional
9  officers from other inmates. (ECF No. 70-4, ¶¶ 6-7; ECF No. 70-5, ¶¶ 5-6.) In this instance,
10 defendants McKeown and Stephens-Merrill both assessed the fight to be an emergency situation
11 requiring an immediate response to quickly restore order within the building and to secure the
12 safety of inmates and staff in the vicinity. (Id.) Defendants McKeown and Stephens-Merrill
13 believed the fight could have resulted in serious injury to one or both inmates if it continued or
14 escalated into a larger, more violent situation involving other inmates in the area. (Id.)
15       CDCR policy provides that each option for use of force has specific qualities that should
16 be considered when choosing which option to deploy. (ECF No. 70-4, ¶ 5.) Factors to consider
17 include an option's range of effectiveness, the level of potential injury, staff safety, the option's
18 deployment methodology, the level of threat presented, and the distance between correctional
19 staff and the inmate(s), the number of staff and inmates involved, and the inmates' ability to
20 understand and comply with orders. (Id.)
21       Defendant McKeown chose to deploy her pepper-spray canister when she perceived
22 plaintiff and inmate Robinson were not complying with orders to get down and stop fighting
23 because she believed it was the safest force option at the time. (ECF No. 70-4, ¶ 5.) In making
24 this decision, McKeown considered her location and the fact that she could deploy her pepper-
25 spray from a distance. (Id.) McKeown aimed her pepper-spray burst at the inmates' facial area
26 because spraying to the face is the most effective way to incapacitate the person(s) targeted and
27 thereby stop the inmates from fighting. (Id.) She aimed at both inmates' faces because they were
28 physically close together and their faces were proximate to one another. (Id.)

7

1    The practice at CMF in March 2018 for physician assessment of inmates who sustained injuries was to utilize an "on-call" procedure during the evening hours. (ECF No. 70-6, ¶ 3 & Ex. 1.) Under this procedure, instead of having a physician always working at CMF, a physician would be assigned to be available by telephone. (Id.) Defendant McAllister was the on-call physician on the evening of March 1, 2018. (Id.)

Dr. McAllister's on-call log reflects that at 1814 hours on March 1, 2018, he was called by CMF hospice staff and told that an inmate/patient had died. (ECF No. 70-6, ¶¶ 4-5 & Ex. 2.) While still at CMF that night, Dr. McAllister received eight telephone calls regarding inmate/patient issues which were addressed over the telephone and he saw two inmate patients. (Id., ¶ 6 & Ex. 2.) At 2035 hours, Dr. McAllister saw and personally interacted with a high-risk cardiac patient with chest pain. (Id.) At 2130 hours, he sutured an inmate/patient who had sustained a laceration at his upper lip. (Id.)

While he was seeing the chest pain patient, and before suturing the patient with the lip laceration, Dr. McAllister received a telephone call about plaintiff. (ECF No. 70-6, ¶ 7 & Ex. 2.) The nurse who called informed Dr. McAllister that plaintiff had sustained a non-serious contusion of his left knee during an altercation and did not need to be seen at the present time. (Id.) Based on the information relayed, Dr. McAllister ordered a prescription for plaintiff to take Ibuprofen for reported pain and ordered that plaintiff be scheduled for a follow up evaluation the next day by the primary care team assigned to treat him. (Id., ¶¶ 7-8.)

In Dr. McAllister's opinion, no further treatment of plaintiff was medically indicated at the time he was consulted by telephone concerning plaintiff's condition. (ECF No. 70-6, ¶ 8.) The nurse on whom Dr. McAllister relied was well-trained on what conditions need to be seen by a physician immediately versus what should instead be seen by the primary care team the next day. (Id., ¶ 7.) Additionally, x-rays were not available after hours, and it was important to have these completed with results available at the time of an examination. (Id.)

The next day, on March 2, 2018, plaintiff was assessed by Nurse Harris during an in-person appointment. (ECF No. 70-7, ¶ 4 & Ex. 3; ECF No. 71, ¶ 3.) Dr. Ota ordered x-rays of plaintiff's left knee which were completed that day. (ECF No. 70-7, ¶¶ 3-4 & Exs. 1-2.) Dr. Ota

8

prepared a letter informing plaintiff the x-ray results showed no fracture. (Id.) Dr. Ota also ordered crutches for plaintiff which were issued that day. (Id., ¶ 5 & Ex. 3.)

In Dr. Ota's medical judgment, crutches were a reasonable and appropriate medical accommodation to facilitate ambulation for a unilateral knee injury of the type presented by plaintiff. (ECF No. 70-7, ¶ 5.) If plaintiff had an issue with using crutches to access his cell, then it was plaintiff's responsibility to notify staff responsible for housing arrangements. (Id., ¶ 5.) In Dr. Ota's opinion, it was not medically necessary for her to also personally examine plaintiff on March 2, 2018. (Id., ¶ 4.) The treatment decisions for plaintiff to have x-rays and be issued crutches were based on Nurse Harris' evaluation of plaintiff and the information relayed to Dr. Ota concerning that evaluation and plaintiff's condition. (Id.)

On March 16, 2018, Dr. Ota examined plaintiff to assess injuries to both of plaintiff's knees. (ECF No. 70-7, ¶ 6 & Ex. 4.) Plaintiff complained of pain to his knees and had knee joint laxity. (Id.) On examining plaintiff, and based on her medical judgment, Dr. Ota ordered the following: MRIs of both of plaintiff's knees on an "as soon as possible" basis; that plaintiff be referred to an orthopedic surgeon for further evaluation; knee immobilizer applications (braces and ace wrap) for both knees; pain medications; and that plaintiff be scheduled for a follow up visit after the MRIs and orthopedic consultation had been completed. (Id.)

On March 23, 2018, Dr. Ota examined plaintiff at the CMF medical clinic to assess the injuries to both of plaintiff's knees. (ECF No. 70-7, ¶ 7 & Ex. 5.) The results for the MRIs of the knees ordered on March 16, 2018, were not yet available. (Id.) Dr. Ota noted plaintiff's appointment for the referral to an orthopedic specialist was scheduled for the following week. (Id.) Dr. Ota ordered a temporary foam block for plaintiff to elevate his legs. (Id.) Dr. Ota confirmed that plaintiff understood his treatment plan. (Id.) Dr. Ota ordered that plaintiff be scheduled for a follow up appointment in the CMF medical clinic after the orthopedic consultation was completed. (Id.) Dr. Ota instructed plaintiff to use Form 7362 to request health care services if needed. (Id.)

After March 23, 2023, all treatment of plaintiff's knee injuries was conducted in accordance with the recommendations of the orthopedic specialists to whom Dr. Ota had referred

9

1  plaintiff. (ECF No. 70-7, ¶ 8.)

## DISCUSSION

**I.      Excessive Force**

**A.      Legal Standard**

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is… whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillan, 503 U.S. 1, 7 (1992). The malicious and sadistic use of force to cause harm always violates contemporary standards of decency in violation of the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 327 (1986).

The use of pepper spray can implicate a prisoner's Eighth Amendment right to be free from the use of excessive use of force. See Clement v. Gomez, 298 F.3d 898, 903-04 (9th Cir. 2002); DeSpain v. Uphoff, 264 F.3d 965, 978 (10th Cir. 2001). The court's inquiry into an excessive force claim focuses on the extent of the prisoner's injury, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. Hudson, 503 U.S. at 7. "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force causes should be granted sparingly." Avina v. United States, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted).

**B.      Analysis**

Viewing the record in the light most favorable to plaintiff, both defendant McKeown and defendant Stephens-Merrill sprayed plaintiff directly in the face with pepper spray while inmate Robinson held plaintiff in a choke hold and was punching plaintiff. It is undisputed that both defendants had ordered the inmates to get down and stop fighting, but the fighting did not stop. Both McKeown and Stephens-Merrill thus attempted to temper the severity of their forceful response by giving orders to get down and stop fighting before deploying the force at issue, which

is a factor tending to indicate the force was applied in a good-faith effort to maintain or restore discipline, rather than maliciously and sadistically to cause harm. See Williams v. Austen, No. 4:19-CV-06882 YGR, 2021 WL 4222079, at *6 (N.D. Cal. Sept. 16, 2021) (holding a 40 mm. round was fired in a good-faith effort to restore order where neither verbal commands nor the use of chemical agent grenades had stopped the fight).

In addition, it is undisputed that inmate Robinson held plaintiff in a choke hold when pepper spray was dispensed directly in plaintiff's face and also in inmate Robinson's face, after the unsuccessful orders were given to get down and stop fighting. Even assuming plaintiff's allegation is true that dispensing pepper spray in this manner did not stop Robinson and instead had the effect of assisting Robinson to continue attacking plaintiff, this allegation alone does not lead to the inference that any defendant used the pepper spray maliciously and sadistically for the very purpose of causing harm. Officials "can have reasonable, but mistaken, beliefs as to the facts establishing the existence of… exigent circumstances… and in those situations courts will not hold that they have violated the Constitution." Clement, 298 F.3d at 903 (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001) (overruled in part on other grounds)). If the evidence only involves a "dispute over the ... existence of arguably superior alternatives," then the plaintiff has not met his burden and the case should not be presented to a jury. Berg v. Kincheloe, 794 F.2d 457, 462 (9th Cir. 1986).[4]

Moreover, plaintiff's argument that the defendants' actions were improper because plaintiff could have defended himself (ECF No. 77 at 17) must be rejected. Maintaining order in a prison is an important penological interest. See Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to present internal order and discipline and to maintain institutional security."). California regulations applicable to CDCR confirm the appropriateness of using force in the situation confronted. See Cal. Code Regs. tit. 15 § 3286 ("When incarcerated persons fight, the participants must be separated at once."); §

---

[4] Plaintiff does not identify any arguably superior alternatives that defendants McKeown and Stephens-Merrill could have used.

3268(b) ("Employees may use reasonable force as required in the performance of their duties….").

Under the undisputed facts in this case, no reasonable jury could find a lack of a need for application of any force or that defendants did not reasonably perceive a serious ongoing threat to plaintiff's safety as well as institutional security. Nothing before the court indicates defendant McKeown or defendant Stephens-Merrill intended any harm toward plaintiff other than the harm normally associated with pepper spray. The physical injury plaintiff suffered as a result of the pepper spray—a knee injury from slipping and falling—is not one that a reasonable officer would necessarily have foreseen as a result of deploying the pepper spray. There is no evidence before the court that either defendant's use of pepper spray was malicious or sadistic.[5]

Considering the relevant factors and looking at the relationship between the need for force and the amount of force used, the amount of force used by defendants in deploying pepper spray was reasonable. See Mayes v. Edwards, No. 2:19-CV-2236 CKD P, 2022 WL 463396, at *4 (E.D. Cal. Feb. 15, 2022), report and recommendation adopted, No. 2:19-CV-02236-TLN-CKD, 2022 WL 891607 (E.D. Cal. Mar. 25, 2022) ("Generally, the use of pepper-spray to stop inmates from fighting does not violate the Eighth Amendment"); Billups v. Ramirez, No. 1:07-CV-00062-CKJ, 2009 WL 1456641, at *7 (E.D. Cal. May 22, 2009) (use of pepper spray and batons on an inmate in an attempt to stop a fight did not violate the Eighth Amendment). There is no genuine issue of material fact for trial on the issue whether the force used by defendants Stephens-Merrill and/or McKeown was excessive in violation of the Eighth Amendment. Accordingly, the defendants' motion for summary judgment should be granted as to the excessive force claims.

## II.    Deliberate Indifference

### A.    Legal Standard

Denial or delay of medical care for a prisoner's serious medical needs may constitute a violation of the prisoner's Eighth Amendment rights. Estelle v. Gamble, 429 U.S. 97, 104-05

---

[5] Plaintiff argues he also took "baton strikes" from defendant McKeown which constituted excessive force. (ECF No. 77 at 14.) However, plaintiff neither pleaded the baton strikes in his complaint (see ECF No. 31 at 4 ["other officers were delivering strikes to the attacking inmate with their expandable batons"]) nor submitted competent evidence supporting such an argument.

1  (1976). An individual is liable for such a violation only when the individual is deliberately

2  indifferent to a prisoner's serious medical needs. Id.; see Jett v. Penner, 439 F.3d 1091, 1096 (9th

3  Cir. 2006); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002); Lopez, 203 F.3d at 1131-32.

4       In the Ninth Circuit, the test for deliberate indifference consists of two parts. Jett, 439 F.3d

5  at 1096, citing McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1991), overruled on other grounds by

6  WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc). First, the plaintiff must

7  show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could

8  result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id., citing

9  Estelle, 429 U.S. at 104. "Examples of serious medical needs include '[t]he existence of an injury

10 that a reasonable doctor or patient would find important and worthy of comment or treatment; the

11 presence of a medical condition that significantly affects an individual's daily activities; or the

12 existence of chronic and substantial pain.'" Lopez, 203 F. 3d at 1131-1132, citing McGuckin, 974

13 F.2d at 1059-60.

14      Second, the plaintiff must show the defendant's response to the need was deliberately

15 indifferent. Jett, 439 F.3d at 1096. This second prong is satisfied by showing (a) a purposeful act

16 or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

17 indifference. Id. Under this standard, the prison official must not only "be aware of facts from

18 which the inference could be drawn that a substantial risk of serious harm exists," but that person

19 "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). This "subjective

20 approach" focuses only "on what a defendant's mental attitude actually was." Id. at 839.

21      A showing of merely negligent medical care is not enough to establish a constitutional

22 violation. Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998), citing Estelle, 429 U.S. at 105-

23 106. A difference of opinion about the proper course of treatment is not deliberate indifference,

24 nor does a dispute between a prisoner and prison officials over the necessity for or extent of

25 medical treatment amount to a constitutional violation. See, e.g., Toguchi v. Chung, 391 F.3d

26 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Furthermore,

27 mere delay of medical treatment, "without more, is insufficient to state a claim of deliberate

28 medical indifference." Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.

1985). When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay caused "significant harm and that [d]efendants should have known this to be the case." Hallett, 296 F.3d at 745-46; see also McGuckin, 974 F.2d at 1060.

### B. Analysis

Defendants do not dispute that plaintiff had a serious medical need with respect to his knee injuries. (ECF No. 70-1 at 18.) The court therefore focuses on their responses to plaintiff's serious medical need.

#### 1. Dr. McAllister

As the on-call physician on the evening of March 1, 2028, Dr. McAllister reasonably relied on the nurse who called him and relayed information about plaintiff in determining the course of treatment that plaintiff be given a prescription for Ibuprofen for reported pain and be scheduled for a follow up evaluation the next day by his primary care team. Plaintiff argues he had "a hole in his left knee with severe bruising and bleeding…" and that the nurses knew he needed "immediate x-rays" and that they conveyed these facts to Dr. McAllister, who intentionally denied or delayed treatment. (ECF No. 90 at 10; see also ECF No. 31 at 12.) However, the facts viewed in the light most favorable to plaintiff do not support the argument. Plaintiff fails to dispute with competent evidence that the nurse who called Dr. McAllister informed him plaintiff did not need to be seen by the doctor that night. It is also undisputed that x-rays were not available after hours. Plaintiff's disagreement with the course of treatment chosen, and specifically, his personal opinion that he should have been taken to the hospital that night for x-rays, does not suffice to show Dr. McAllister chose a course of treatment that was medically unacceptable under the circumstances, or that he was otherwise deliberately indifferent. See Toguchi, 391 F.3d at 1058; Sanchez, 891 F.2d at 242.

Plaintiff fails to raise a genuine dispute of material fact for trial regarding Dr. McAllister's alleged purposeful failure to respond to plaintiff's pain or medical need. There is also no evidence that defendant McAllister knew a delay in treatment until the following day would cause significant harm. See Farmer, 511 U.S. at 837 (the defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must

also draw the inference"); Hallett, 296 F.3d at 745-46; McGuckin, 974 F.2d at 1060. Thus, the defendants' motion for summary judgment should be granted as to plaintiff's deliberate indifference claim against Dr. McAllister.

### 2. Dr. Ota and Nurse Harris

Similarly, plaintiff fails to raise a genuine dispute of material fact for trial regarding the alleged deliberate indifference of Dr. Ota and Nurse Harris. Plaintiff was assessed by Nurse Harris during an in-person appointment on March 2, 2018, the day after plaintiff sustained the injury to his left knee. That same day, and based on Nurse Harris' assessment, Dr. Ota ordered x-rays of plaintiff's left knee which were completed that day. Before the end of the day, Dr. Ota prepared a letter informing plaintiff the x-ray results showed no fracture. Dr. Ota also ordered crutches for plaintiff which Nurse Harris issued to plaintiff that day.

On March 16, 2018, and again on March 23, 2018, Dr. Ota examined plaintiff again to assess injuries to both knees. On March 16, Dr. Ota ordered MRIs on an "as soon as possible" basis, referred plaintiff to an orthopedic specialist, ordered that plaintiff be issued a knee brace, and ordered that a follow up visit be scheduled. On March 23, Dr. Ota examined plaintiff, noted the MRIs were not yet available, noted that plaintiff's appointment for the referral to an orthopedic specialist was scheduled for the following week, and ordered that plaintiff be scheduled for a follow up appointment in the CMF medical clinic after the orthopedic consultation was completed. After March 23, 2023, all treatment of plaintiff's knee injuries was conducted in accordance with the recommendations of the orthopedic specialists.

Plaintiff fails to submit any evidence suggesting Dr. Ota and/or Nurse Harris acted with deliberate indifference to plaintiff's knee injuries. In Dr. Ota's medical judgment, crutches were a reasonable and appropriate medical accommodation to facilitate ambulation for a unilateral knee injury of the type presented by plaintiff, and it was not medically necessary for her to personally examine plaintiff on March 2, 2018, instead of or in addition to the examination by a nurse. Plaintiff has submitted no evidence suggesting that the treatment decisions made were medically unacceptable under the circumstances, or that Nurse Harris or Dr. Ota were otherwise deliberately indifferent. Plaintiff's argument that he was adamant that he did not want crutches and that he

1 instead requested a wheelchair, walker, or cane, and told Nurse Harris he had problems with
2 crutches in the past and would fall (ECF No. 77 at 12-13) would not suggest deliberate
3 indifference on the part of any defendant even if plaintiff had submitted competent evidence to
4 support the argument. There is no evidence Nurse Harris or Dr. Ota knew issuing crutches put
5 plaintiff at a risk of serious harm, or that issuing crutches was medically inappropriate under the
6 circumstances. Plaintiff's personal disagreement regarding the appropriateness of being issued
7 crutches instead of a wheelchair, walker, or cane does not suffice to raise a genuine dispute of
8 material fact for trial. See Toguchi, 391 F.3d at 1058; Sanchez, 891 F.2d at 242.

Viewing the evidence in the light most favorable to plaintiff, there is no evidence that either Dr. Ota or Nurse Harris was aware that a substantial risk of serious harm existed to plaintiff which they purposefully disregarded. See Farmer, 511 U.S. at 837. Accordingly, the defendants' motion for summary judgment should be granted as to plaintiff's deliberate indifference claim against Dr. Ota and Nurse Harris.

**PLAIN LANGUAGE SUMMARY FOR PRO SE PARTY**

The following information is meant to explain this order in plain English and is not intended as legal advice.

The court has reviewed the evidence submitted in the pending motion for summary judgment and your oppositions, along with the allegations in your verified second amended complaint and concluded there is no genuine issue of material fact for trial. Therefore, the undersigned is recommending the defendants' motion for summary judgment be granted. You have 14 days to explain to the court why this is not the correct outcome. If you choose to do so, label your explanation "Objections to Magistrate Judge's Findings and Recommendations." The district court judge assigned to your case will review any timely objections filed and make a final decision on the motion for summary judgment.

////
////
////
////

**CONCLUSION**

For the reasons set forth above, IT IS RECOMMENDED as follows:

1. Defendants' motion for summary judgment (ECF No. 70) be GRANTED.

2. The Clerk of Court be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within 7 days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 6, 2025

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

8, mcco0369.msj